1  Laurence F. Pulgram (CSB No. 115163)
   lpulgram@fenwick.com
2  Tyler G. Newby (CSB No. 205790)
   tnewby@fenwick.com
3  Annasara G. Purcell (CSB No. 295512)
   apurcell@fenwick.com
4  FENWICK & WEST LLP
   555 California Street, 12th Floor
5  San Francisco, CA  94104
   Telephone:  415.875.2300
6  Facsimile:  415.281.1350

7  Attorneys for Defendant
   UBER TECHNOLOGIES, INC.

8

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12

13  VAMSI TADEPALLI,                    Case No.:

14            Plaintiff,               **NOTICE OF REMOVAL**

15     v.

16  UBER TECHNOLOGIES, INC.,            Action Filed:  December 3, 2014

17            Defendant.

18         PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332, 1441, 1446,

19  and 1453 Defendant Uber Technologies, Inc. ("Uber" or "Defendant") removes this

20  action from the Superior Court of the State of California for the County of San

21  Francisco, and in support of this removal states as follows:

22              **PROCEDURAL HISTORY AND NOTICE TIMING**

23         1.     On December 3, 2014, Plaintiff Vamsi Tadepalli filed this proposed

24  class action in the Superior Court of the State of California for San Francisco

25  County.  *See* Ex. A (Original Complaint).  Plaintiff claims violation of California's

26  Unfair Competition Law, Cal. Bus, & Prof. Code §§ 17200 *et seq*., breach of

27  contract, breach of good faith and fair dealing, unjust enrichment and restitution,

28  accounting, conversion, fraudulent concealment, and constructive trust.

NOTICE OF REMOVAL

1

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2.      On September 21, 2015, pursuant to a stipulation granting Plaintiff leave to amend his Complaint, Plaintiff filed a Second Amended Complaint.  *See* Ex. B (Second Amended Complaint).  Defendants were electronically served with the Second Amended Complaint on the same day it was filed.

3.      This notice of removal is timely filed because it is within 30 days of service of the Second Amended Complaint, which was the first pleading in the action giving rise to federal jurisdiction, and within the time period provided in 28 U.S.C. § 1446(b).

4.      San Francisco County, where the action is currently pending, is located within the United States District Court for the Northern District of California.

5.      No previous notice of removal has been filed in this case.

## JURISDICTION

6.      This Court has jurisdiction over this putative class action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because: (1) the citizenship of at least one proposed class member (in the Second Amended Complaint) is different than that of Uber; (2) the amount in controversy, aggregated for all class members, exceeds $5 million, exclusive of interests and costs; and (3) the proposed class consists of at least 100 members.

7.      Sufficient diversity of citizenship is present, as the citizenship of at least one proposed class members is different than that of Uber.  Uber is a Delaware corporation with its principle place of business in San Francisco, California.  Second Amended Complaint ¶ 11.  Plaintiff seeks to represent a class of all consumers who, since June of 2010, were picked up or dropped off by an Uber transportation provider partner at a California airport, and paid a charge to Uber designated as an airport fee toll that was not remitted to the airport.  *Id.*  ¶ 48.  Given this class definition—allegedly encompassing almost anyone who took an Uber to or from a California airport over a five year period of time—the class

Fenwick & West LLP
Attorneys at Law
San Francisco

NOTICE OF REMOVAL

undoubtedly contains members who are residents of neither California nor Delaware.

8.      Plaintiff alleges that "the prospective class numbers is at least in the tens of thousands . . . " Second Amended Complaint ¶ 49. Therefore the proposed class is greater than 100 members and satisfies the minimum set forth in § 1332(d).

9.      The amount in controversy exceeds $5 million. Plaintiff seeks four types of relief in his Complaint: a return of fees paid by users, punitive damages, attorneys' fees, and injunctive relief. *See* Second Amended Complaint ¶¶ 61, 74. For purposes of CAFA jurisdiction, each of these types of relief is properly included in the Court's determination of the amount in controversy. *See Rippee v. Boston Market Corp.*, 408 F. Supp. 2d 982, 984 (S.D. Cal. 2005) ("The calculation of the amount in controversy takes into account claims for 'general' damages, 'special' damages, punitive damages if recoverable as a matter of law, and attorneys' fees recoverable by statute or contract."); *Otay Hydraulics v. Safety-Kleen Systems, Inc.*, No. 2:12-cv-07357-OWD, 2013 WL 1898573, at *2 (C.D. Cal. May 6, 2013) ("If a defendant's cost of complying with an injunction would exceed the jurisdictional floor, that compliance cost represents the amount in controversy for jurisdiction purposes."). In the aggregate, this relief exceeds the $5 million CAFA threshold.

10.     Plaintiff challenges Uber's alleged practice of charging riders an "Airport Fee Toll" for each trip to several California airports, and seeks the return of all such fees paid. The amount of the airport surcharge collected to date exceeds $1.7 million. Plaintiff also prays for punitive damages above that amount and alleges that the class is entitled to such damages under California Civil Code §§ 3294 *et seq.* Second Amended Complaint ¶ 87. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). Plaintiff also seeks attorneys' fees as authorized by statute in connection with claims under the Unfair Competition Law. Second Amended Complaint ¶ 61. For purposes of determining CAFA jurisdiction,

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

NOTICE OF REMOVAL

courts in the Ninth Circuit assume that a request for attorney fees adds an additional 25% of any potential recovery to the amount in controversy. *Rodriguez v. CleanSource, Inc.*, No. 14-cv-0789-L(DHB), 2014 WL 3818304, at *2 (S.D. Cal. Aug. 4, 2014) (collecting cases). Finally, Plaintiff seeks injunctive relief prohibiting Uber from continuing to collect any airport fees above those imposed by airport authorities. Based on current usage, this request for relief puts at issue over $1 million in charges per year for the indefinite future. Collectively, actual damages and/or restitution, potential punitive damages, potential attorney fees, and the value or cost of injunctive relief exceed $5,000,000, thereby rendering the amount in controversy beyond CAFA's threshold.

## NOTICE AND SERVICE

11. A notice of this removal together with a copy of this Notice, shall be filed with the Superior Court of the State of California for the County of San Francisco, and shall be served on opposing counsel.

Dated: September 22, 2015             FENWICK & WEST LLP


                                      By:*/s/ Laurence F. Pulgram*
                                         Laurence F. Pulgram
                                         Tyler G. Newby
                                         Annasara G. Purcell
                                         Attorneys for Defendant

                                         Attorneys for Defendant UBER
                                         TECHNOLOGIES, INC.

NOTICE OF REMOVAL

FENWICK & WEST LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT A

1 SCHNEIDER WALLACE COTTRELL
2 KONECKY WOTKYNS LLP
  Todd M. Schneider (SBN 158253)
3 180 Montgomery Street, Suite 2000
  San Francisco, California 94104
4 Telephone: (415) 421-7100
  Facsimile: (415) 421-7105
5 tschneider@schneiderwallace.com

6 Attorney for Plaintiff
7 [additional counsel identified below]

**F I L E D**
Superior Court of California
County of San Francisco

DEC 09 2014

CLERK OF THE COURT
BY: Mary Ann Moran
Deputy Clerk

8

9 SUPERIOR COURT OF THE STATE OF CALIFORNIA

10 COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

11 VAMSI TADEPALLI, on behalf of himself | Case No.: **CGC - 14 - 543032**
12 and others similarly situated,

13         Plaintiff,

vs.

14 UBER TECHNOLOGIES, INC.,

15         Defendant.

16

17

18

19

20

**CLASS ACTION COMPLAINT**

1. Cal. Bus. & Prof. Code §§ 17200, et seq.
2. Breach of Contract
3. Breach of Good Faith and Fair Dealing
4. Unjust Enrichment and Restitution
5. Accounting
6. Conversion
7. Fraudulent Concealment
8. Constructive Trust

**JURY TRIAL DEMANDED**

21 <u>**INTRODUCTION**</u>

22    1.    Uber Technologies, Inc. ("Uber") operates a "ride sharing" service that
23
24 transports customers throughout the San Francisco area for a fee. Uber passengers
25 summon Uber vehicles using a cell phone "app," and pay the fare through the same app.

26    2.    The California Public Utilities Commission ("CPUC") categorizes Uber as a
27 "transportation network company," not a licensed taxi service.

28    3.    Uber vehicles transporting passengers to and from San Francisco

International Airport ("SFO") charge a fare, plus an additional $4.00 fee for a so-called "SFO Airport Fee Toll."

4.    Neither the CPUC nor SFO charge Uber drivers any tax, fee, toll, or surcharge for airport pick-ups or drop-offs.

5.    On Tuesday, November 25, 2014, SFO announced it will begin charging ride-sharing firms, like Uber, $3.85 for each passenger they drop off or pick up at SFO. *See SFO Leads Way on Ride-Sharing Rules*, San Francisco Chronicle, Nov. 25, 2014, available at http://www.sfgate.com/opinoin/editorials/article/ SFO-leads-the-way-on-ride-sharing-rules-5917820.php, last visited on Nov. 28, 2014.  The article confirms that SFO has not been charging Uber the so-called SFO Airport Fee Toll.

6.    This class action seeks declaratory, injunctive, and monetary relief on behalf of a class of Uber passengers in California who paid the SFO Airport Fee Toll to Uber when no such fee existed.

### PARTIES

7.    Mr. Tadepalli is an adult residing in San Francisco County, California.

8.    Uber is a California corporation with its principal place of business in San Francisco, California.

### JURISDICTION AND VENUE

9.    This Court has jurisdiction over all the claims asserted herein pursuant to the California Constitution, Article VI § 10.

10.    This Court has jurisdiction over all the claims asserted herein under California Code of Civil Procedure § 410.10 because the alleged damages exceed the jurisdiction minimum of the Court.

11.    Venue is proper in this Court because Mr. Tadepalli resides here.  A substantial part of the events or omissions giving rise to the claims herein occurred here.

12.     Venue is proper under California Civil Code Procedure §§ 1780(c) and 393(a) because Uber's principal place of business is here.

## FACTS

### Uber's Download and Registration Process Obscures the Terms & Conditions Uber Imposes on Its Customers

13.     Mr. Tadepalli downloaded the Uber app on his iPhone and created an Uber account on or about May 4, 2012.

14.     Mr. Tadepalli followed the registration process to create an Uber account. This process required Mr. Tadepalli to input identifying information on a screen on his mobile device, and provide a credit card account number.

15.     On touchscreen devices like the iPhone, an electronic keyboard obscures the lower half of the screen as information is inputted into each required field: email address, mobile telephone number, password, first and last name, and credit card account information.



Opening Screen          Basic Details          Promo Code: SWAPMYAPP

16.     As Mr. Tadepalli provided the information in the required fields, the lower

half of his screen was obscured by the electronic keyboard.



17.     At the conclusion of the registration process, the app displayed a screen to

Mr. Tadepalli, the bottom of which referenced a hyperlink to Uber's "Terms & Conditions

and Privacy Policy."



4

18.  At no step during the registration process were the referenced "Terms & Conditions" displayed to Mr. Tadepalli.

19.  Nor did Uber's registration process require, either as a condition of initially using its app or its ride share service, Mr. Tadepalli to access the "Terms & Conditions" hyperlink, read the "Terms & Conditions," or affirmatively assent to them.

20.  Mr. Tadepalli did not access the "Terms & Conditions" hyperlink, read the "Terms & Conditions," or affirmatively assent to them.

**Uber's Terms & Conditions Attempt to Abrogate Basic Legal Rights**

21.  Each prospective Uber user must register and create an Uber account using the same steps and viewing the same screens as Mr. Tadepalli.

22.  Uber's inconspicuous "terms & conditions" contain a number of grossly one-sided provisions, which purport to contract away all possible legal obligations to its customers, including even any obligation to provide a safe vehicle, or a safe driver, while retaining its right to payment regardless of whether a ride is completed.

23.  Uber's "Terms & Conditions" contain a complete disclaimer of warranties, which disavows virtually every conceivable basis upon which a reasonable user would rely in using the app and the ride share service:

> The company makes ***no representation, warranty, or guaranty*** on the reliability, timeliness, quality, suitability, availability, accuracy or completeness of the service or application. ....

> The service and application is provided to you ***strictly on an "as is" basis. All conditions, representations and warranties,*** whether express, implied, statutory or otherwise, including, without limitation, any implied warranty of merchantability, fitness for a particular purpose, or non-infringement of third party rights, are ***disclaimed to the maximum extent permitted by applicable law ....***

> You acknowledge and ***agree that the entire risk*** arising out of your use of the application and service, and any third party services or products ***remains solely with you,*** to the maximum extent permitted by law.

5

(Emphasis added).

24.     Uber's "Terms & Conditions" contain a "no refund" policy, encompassing "[a]ny fees that the Company may charge you...." This "no refund policy shall apply at all times regardless of your decision to terminate your usage, our decision to terminate your usage, disruption caused to our Application or Service either planned, accidental or intentional, *or any reason whatsoever.*" (Emphasis added).

25.     Uber's "Terms & Conditions" contain a Liability Disclaimer, by which Uber purports to absolve itself of all liability arising out of using its app or ride share service.

26.     Uber imposes upon every passenger a $1 "Safe Rides Fee." Uber expressly represents that this Safe Rides Fee "supports our continued efforts to ensure the *safest possible platform for Uber riders* and drivers, including an *industry-leading background check* process, regular motor vehicle checks, driver safety education, development of *safety features in the app,* and insurance. For complete pricing *transparency,* you'll see this as a separate line item on every UberX receipt." (Emphasis added).

27.     Despite its express representation that it is "committed to connecting you with the safest rides on the road," Uber disclaims "*any and all any liability... in any way related to the third party transportation provider....* " (Emphasis added).

28.     Although it expressly represents that it employs an "*industry-leading background check* process," Uber disclaims any responsibility to "*assess the suitability, legality or ability of any [drivers.]*" (Emphasis added).

29.     Although expressly representing that it conducts "regular motor vehicle checks [and] driver safety education," Uber's "Terms & Conditions" disavow any responsibility for the rider's safety: "***You understand, therefore, that by using the***

**application and the service, *you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe* or otherwise objectionable, and that *you use the application and the service at your own risk*.**" (Emphasis added).

### In Contrast, Uber's Surge Pricing Clearly Discloses Terms and Requires Customers to Affirmatively Agree to Those Terms

30.    In contrast to the passive "Terms & Conditions" disclosure, which does not require the customer's affirmative assent to those terms, Uber informs the customer before imposing any charges that surge pricing will be applied. Uber discloses the amount of the surge pricing surcharge, and requires the customer to affirmatively agree to that surcharge before it acknowledges that an agreement on those terms has been reached between the customer and Uber.

31.    Uber's stated purpose for this multi-step process is that it wants to ensure that these contract terms are "clear and straightforward." *See* The Uber Resolution – Always A Reliable Ride!, available at http://blog.uber.com/2012/12/28/surge2012/, last visited on November 28, 2014.

32.     Uber illustrates this three-step process on its website.

  

33.     By using this "clear and straightforward" disclosure process, coupled with requiring the customer's affirmative election to accept the disclosed terms, Uber hopes to ensure that, at least with respect to its surge pricing, its customers "won't be surprised" by the terms of its contract. *Id.*

**Facts Pertaining to Mr. Tadepalli's Uber Transaction**

34.     On July 23, 2014, Mr. Tadepalli used the Uber app to obtain transportation to SFO.

35.     Mr. Tadepalli paid $27.57 for the trip to the airport, including the $4.00 "SFO Airport Fee Toll."

36.   Uber itemized its charges as follows on the electronic invoice it sent to him via email:



## CLASS ALLEGATIONS

37.   When an Uber customer purchases a ride to SFO, the customer receives an itemized electronic receipt, which includes a $4.00 charge for the "SFO Airport Fee Toll."

38.   On the receipt, next to the line for the "SFO Airport Fee Toll," there is a "?" hyperlink.

39.   The "?" hyperlink leads to the Uber website, and contains the following explanation: "In select cities, there may be a nominal surcharge to reimburse drivers for any airport fees they are charged as part of your trip." *See What is this Charge For A Toll?,* available at: https://support.uber.com/hc/en-us/articles/201836666-What-is-this-charge-for-a-toll-., last visited on November 28, 2014.

9

40.     Uber vehicles, which are not licensed livery services, are not currently charged a fee of any sort for picking-up or dropping-off dropping passengers off at SFO.

41.     Uber has imposed the fictitious "SFO Airport Fee Toll" upon tens of thousands of passengers, and continues to do so. Although, SFO announced that in the future it will charge Uber $3.85 to pick up and drop off passengers – Uber's $4.00 SFO Airport Fee Toll will still be excessive and result in customers paying more than they should pay under the circumstances.

42.     The class is composed of all California residents who, since June of 2010:

  (a) paid an Uber invoice including a $4.00 charge designated as "SFO Airport Fee Toll"; and

  (b) SFO did not impose any fee, toll, or surcharge upon the Uber driver for the invoiced trip.

43.     Based on Uber's SFO Airport ride volume, the prospective class numbers in the tens of thousands, making joinder of all members impracticable. The exact size of the proposed class and the identity of the class members are readily ascertainable from Uber's business records.

44.     There are questions of law and fact common to the class, which predominate over any questions affecting only individual class members. The principal common issues with respect to the class include: whether Uber's "SFO Airport Fee Toll" is unlawful, unfair, or fraudulent within the meaning of California Business and Professions Code §17200; whether Uber breaches its contract with class members; whether the "SFO Airport Fee Toll" violates Uber's requirement of good faith and fair dealing; and whether Uber's retention of amounts in excess of any actual tolls paid constitutes unjust enrichment.

45.     There are no difficulties likely to be encountered by the Court in the management of this proposed class action. There are no individual questions, other than

1  those which can be determined by ministerial inspection of Uber's records, and the

2  issues of liability are determinable entirely from the face of the operative documents.

3      46.    Mr. Tadepalli's class claims are typical of those of the class he seeks to

4  represent, and he will fairly and adequately protect and represent the interests of the

5  class. There is no conflict between the claims of Mr. Tadepalli as class representative and

6  the claims of the proposed class.

7

8      47.    A class action is superior to other methods for the fair and efficient

9  adjudication of this controversy. Because the damages suffered by the individual class

10  members may be relatively small compared to the expense and burden of litigation, it

11  would be impractical and economically unfeasible for class members to seek redress

12  individually. In addition, it is likely that most class members are unaware that they have

13  claims. Finally, the prosecution of separate actions by the individual class members, even

14  if possible, would create a risk of inconsistent or varying adjudications with respect to

15  the individual class members against Uber.

16

17      48.    Mr. Tadepalli is represented by counsel competent and experienced in both

18  consumer protection and class action litigation.

19  ### FIRST CAUSE OF ACTION
    **(Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

20

21      49.    Mr. Tadepalli incorporates by reference all the foregoing paragraphs.

22      50.    California Business and Professions Code §17200 prohibits any "unlawful

23  ... business act or practice." Uber has violated § 17200's prohibition against engaging in

24  an unlawful act or practice by, *inter alia*, the following

25          a.  violating the California Consumer Legal Remedies Act ("CLRA"), Cal.

26              Civ. Code §§1750 *et seq.*; and

27          b.  violating California Business and Professions Code §17500 *et seq.*;

28

11

c.  violating California Civil Code §1565 *et seq.*; and

d.  violating California Civil Code §1667 *et seq.*

51.     Mr. Tadepalli reserves the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this day.

52.     California Business and Professions Code §17200 prohibits any "unfair ... business act or practice." As detailed in the preceding paragraphs, Uber engages in a systematic scheme by imposing and collecting the SFO Airport Fee Toll from unsuspecting consumers using false pretenses. Mr. Tadepalli and class members would not have paid Uber the SFO Airport Fee Toll otherwise. As a result, Uber engages in unfair business acts and a practice that is prohibited by §17200, *et seq.*

53.     California Business and Professions Code §17200 also prohibits any "fraudulent ... business act or practice." As previously detailed, Uber's conduct was likely to deceive Mr. Tadepalli and class members by representing that it was imposing the SFO Airport Fee Toll to reimburse its drivers for the fee charged by SFO, when in truth, SFO imposed no such fee.

54.     As a result of Uber's unlawful, unfair, and fraudulent business acts and practices Mr. Tadepalli and the class have suffered an injury in fact and lost money.

55.     Pursuant to California Business and Professions Code §17203, Mr. Tadepalli seeks an order requiring Uber to immediately cease such acts of unlawful, unfair, and fraudulent business practices and requiring Uber to return the full amount of money improperly collected to Mr. Tadepalli and the class – plus interest and attorneys' fees.

12

## SECOND CAUSE OF ACTION
### (Breach of Contract)

56.     Mr. Tadepalli incorporates by reference all the foregoing paragraphs.

57.     Uber charged Mr. Tadepalli and the class $4.00 for the purported SFO Airport Fee Toll. Uber represented that this fee was imposed to reimburse drivers for any airport fees or tolls they are charged as part of trips to SFO.

58.     Uber breached its contract with Mr. Tadepalli and the class by imposing the $4.00 charge when SFO did not charge or collect any fees from Uber as part of trips to SFO.

59.     As a proximate result of Uber's breaches, Mr. Tadepalli and the class have been damaged. Uber should be required to disgorge its ill-gotten gains.

## THIRD CAUSE OF ACTION
### (Breach of Good Faith and Fair Dealing Duty)

60.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

61.     Uber's imposition of fictitious and inflated charges violates the covenant of good faith and fair dealing contained in its contracts.

62.     Uber's failure to act in good faith and deal fairly with Mr. Tadepalli and class members is part of a pattern, or consistent with a practice of noncompliance with its contractual obligations.

63.     Uber continues to act in bad faith and to breach the covenant by refusing to return overpaid amounts. As a proximate result of Uber's conduct described herein, Mr. Tadepalli and class members have been damaged.

64.     Uber would be unjustly enriched if it were permitted to retain the unlawfully charged and collected SFO Airport Fee Toll. Uber should therefore be ordered to provide restitution to Mr. Tadepalli and to the class of all amounts overpaid to Uber.

### FOURTH CAUSE OF ACTION
### (Unjust Enrichment and Restitution)

65.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

66.     By charging and collecting a $4.00 fee for a so-called "SFO Airport Fee Toll," as described above, Uber has unjustly received a benefit at the expense of Mr. Tadepalli and the class.

67.     Uber would be unjustly enriched if it were permitted to retain the unlawfully charged and collected amounts. Uber should therefore be ordered to provide restitution to Mr. Tadepalli and the class of all amounts it charged and collected for the SFO Airport Fee Toll.

### FIFTH CAUSE OF ACTION
### (Accounting)

68.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

69.     At various times continuing to the present, Uber has become indebted to Mr. Tadepalli and the class members for money received. The exact amount Uber owes to Mr. Tadepalli and the class can only be ascertained by an accounting.

70.     Mr. Tadepalli therefore requests the Court to order an accounting by Uber of all amounts it charged and collected for the SFO Airport Fee Toll from Mr. Tadepalli and the class, which amounts constitute ill-gotten gains. Mr. Tadepalli requests that he and the class have judgment for all sums due, with interest thereon, as shown by such accounting.

### SIXTH CAUSE OF ACTION
### (Conversion)

71.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

72.     Mr. Tadepalli and class members, were, and still are, entitled to the possession of all monies paid to Uber for the fictitious SFO Airport Fee Toll.



73.   Uber has converted Mr. Tadepalli's and class members' property to its own use. As a proximate result of Uber's conduct described herein, Mr. Tadepalli and the class have been damaged.

### SEVENTH CAUSE OF ACTION
### (Fraudulent Concealment)

74.   Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

75.   Uber intentionally misrepresented to Mr. Tadepalli and the class that SFO was imposing a toll for pick-ups and drop-offs.

76.   Uber intentionally misrepresented that the SFO Airport Fee Toll that Uber charged and collected from Mr. Tadepalli and class members was imposed to reimburse its drivers for amounts paid to SFO.

77.   Uber intentionally concealed from Mr. Tadepalli and the class that SFO did not impose on Uber any tolls for SFO pick-ups or drop-offs.

78.   Uber misrepresented and concealed the true facts surrounding the nature and existence of the SFO Airport Fee Toll that it charged and collected from Mr. Tadepalli and the class.

79.   As a result of Uber's wrongful conduct, Mr. Tadepalli and the class have been damaged.

80.   The wrongful acts of Uber were done with the intent to mislead and defraud; Mr. Tadepalli and the class are entitled to exemplary damages in an amount appropriate to punish and set an example pursuant to California Civil Code §§3294 *et seq.*

### EIGTH CAUSE OF ACTION
### (Constructive Trust)

81.   Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

82.   Uber has held and continues to hold property belonging to Mr. Tadepalli

and the other class members, by which Uber has been unjustly enriched.

83.    By virtue of the foregoing, in equity all such property in possession of Uber belongs to Mr. Tadepalli and the class, to be held in trust for their respective benefits, plus interest thereon.

84.    Mr. Tadepalli and the other class members do not have an adequate remedy at law and will suffer irreparable harm unless a trust is imposed on all such sums and property.

## **PRAYER**

WHEREFORE, Mr. Tadepalli prays for judgment against Uber as follows:

A.    An order certifying this lawsuit as a class action;

B.    Compensatory damages in such amount as the Court deems just and proper;

C.    Statutory damages in such amount as the Court deems just and proper;

D.    Imposition of a constructive trust, an order for an accounting, and granting injunctive relief, or other such equitable relief, including restitution and an order for disgorgement of ill-gotten gains;

E.    Attorney fees;

F.    Costs of litigation;

G.    Prejudgment interest; and

H.    Such other relief as this Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Mr. Tadepalli demands a trial by jury of all issues so triable.

DATED this 3rd day of December, 2014.

SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP

Todd M. Schneider
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com

BAILEY & GLASSER LLP
John Roddy
Elizabeth Ryan
125 Summer Street, Suite 1030
Boston, MA 02110
Telephone: (617) 439-6730
Facsimile: (617) 951-3954
jroddy@baileyglasser.com
eryan@baileyglasser.com

JAILE & TRIFILO LLC
Pedro Jaile
188 Summer Street
East Boston, MA 02128
Telephone: (617) 561-3777
Facsimile: (617) 561-0300
pjaile@jaileandtrifilo.com

*Attorneys for Plaintiffs*

# EXHIBIT B

1
2
3
4
5

SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
Todd M. Schneider (SBN 158253)
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com

6
7

Attorney for Plaintiff
[additional counsel identified below]

8

9

SUPERIOR COURT OF THE STATE OF CALIFORNIA

10

COUNTY OF SAN FRANCISCO – UNLIMITED JURISDICTION

11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| VAMSI TADEPALLI, on behalf of himself and others similarly situated,<br><br>　　　　　　　Plaintiff,<br>vs.<br><br>UBER TECHNOLOGIES, INC.,<br><br>　　　　　　　Defendant. | Case No.: CGC-14-543032<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>1. Cal. Bus. & Prof. Code §§ 17200, et seq.<br>2. Breach of Contract<br>3. Breach of Good Faith and Fair Dealing<br>4. Unjust Enrichment and Restitution<br>5. Accounting<br>6. Conversion<br>7. Fraudulent Concealment<br>8. Constructive Trust<br>9. Cal. Civ. Code §§ 1750, et. seq.<br><br>**JURY TRIAL DEMANDED** |

21
22
23
24
25
26
27
28

## INTRODUCTION

1.　　　Uber Technologies, Inc. ("Uber") operates a "ride sharing" service that transports customers throughout the State of California for a fee. Uber passengers summon Uber vehicles using a cell phone "app," and pay the fare through the same app.

2.　　　The California Public Utilities Commission ("CPUC") categorizes Uber as a "transportation network company," not a licensed taxi service.

3.　　　Uber vehicles transporting passengers to and from California airports

charge a fare, plus an additional fee for so-called airport fee tolls.

4.     Until recently, neither the CPUC nor airports charge Uber drivers any tax, fee, toll, or surcharge for airport pick-ups or drop-offs.

5.     On Tuesday, November 25, 2014, the San Francisco International Airport ("SFO") announced it would begin charging ride-sharing firms, like Uber, an airport fee toll in the amount of $3.85 for each passenger Uber drops off or picks up at SFO. *See SFO Leads Way on Ride-Sharing Rules*, San Francisco Chronicle, available at http://www.sfgate.com/opinoin/editorials/article/SFO-leads-the-way-on-ride-sharing-rules-5917820.php, last visited on June 29, 2015.  On Friday, January 23, 2015, Los Angeles International Airport ("LAX") announced it would begin charging Uber an airport fee toll in the amount of $4.00 (which is the same amount the airport charges taxis) for each passenger Uber picks up or drops off at the airport. *See LAX Planning to Allow Uber and Lyft, While also Deregulating Taxis*, LA Weekly, available at: http//www/laweekly.com/news/lax-planning-to-allow-uber-and-lyft-while-also-deregulating-taxis-5348126, last visited June 29, 2015.

6.     On Friday, March 6, 2015, the Los Angeles Times reported that the John Wayne Airport ("SNA") would begin permitting Uber to operate at the airport. *See O.C. Welcomes Uber, Lyft, Other Ride-Sharing Firms to Join John Wayne Airport,* available at http://www.latimes.com/local/orangecounty/la-me-0305-uber02-150307-story, last visited June 29, 2015.

7.     On Tuesday, June 17, 2014, the Sacramento Bee reported Uber – was not only not paying fees or tolls to the Sacramento Airport – but that Uber had no permission to operate in any capacity on airport property, and that in May of 2014 three Uber drivers were fined $100 each for operating without permission at the airport. *See UberX, Lyft Reject Latest California Regulation Push,* available at

http://www.sacbee.com/news/politics-government/article2601601.html, last visited June 29, 2015.

8.     Each of the foregoing articles confirm that Uber was collecting as a purported pass through airport taxes, fees, or tolls from California consumers but California airports were not charging Uber any corresponding taxes, fees, or tolls.

9.     This class action seeks declaratory, injunctive, and monetary relief on behalf of a nationwide class of Uber passengers who paid Uber drivers any tax, fee, toll, or surcharge for airport pick-ups or drop offs to Uber when no such fee(s) existed.

## PARTIES

10.     Mr. Tadepalli is an adult residing in San Francisco County, California.

11.     Uber is a Delaware corporation with its principal place of business in San Francisco, California.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over all the claims asserted herein pursuant to the California Constitution, Article VI § 10.

13.     This Court has jurisdiction over all the claims asserted herein under California Code of Civil Procedure § 410.10 because the alleged damages exceed the jurisdiction minimum of the Court.

14.     Venue is proper in this Court because Mr. Tadepalli resides here.  A substantial part of the events or omissions giving rise to the claims herein occurred here.

15.     Venue is proper under California Civil Code Procedure §§ 1780(c) and 393(a) because Uber's principal place of business is here.

## <u>FACTS</u>

**Uber's Download and Registration Process Obscures the Terms &
Conditions Uber Imposes on Its Customers**

16.     Mr. Tadepalli downloaded the Uber app on his iPhone and created an Uber account on or about May 4, 2012.

17.     Mr. Tadepalli followed the registration process to create an Uber account. This process required Mr. Tadepalli to input identifying information on a screen on his mobile device, and provide a credit card account number.

18.     On touchscreen devices like the iPhone, an electronic keyboard obscures the lower half of the screen as information is inputted into each required field: email address, mobile telephone number, password, first and last name, and credit card account information.



19.     As Mr. Tadepalli provided the information in the required fields, the lower half of his screen was obscured by the electronic keyboard.



20.     At the conclusion of the registration process, the app displayed a screen to Mr. Tadepalli, the bottom of which referenced a hyperlink to Uber's "Terms & Conditions and Privacy Policy."



21.     At no step during the registration process were the referenced "Terms & Conditions" displayed to Mr. Tadepalli.

5

22.     Nor did Uber's registration process require, either as a condition of initially using its app or its ride share service, Mr. Tadepalli to access the "Terms & Conditions" hyperlink, read the "Terms & Conditions," or affirmatively assent to them.

23.     Mr. Tadepalli did not access the "Terms & Conditions" hyperlink, read the "Terms & Conditions," or affirmatively assent to them.

### Uber's Terms & Conditions Attempt to Abrogate Basic Legal Rights

24.     Each prospective Uber user must register and create an Uber account using the same steps and viewing the same screens as Mr. Tadepalli.

25.     Uber's inconspicuous "terms & conditions" contain several grossly one-sided provisions, which purport to contract away all possible legal obligations to its customers, including even any obligation to provide a safe vehicle, or a safe driver, while retaining its right to payment regardless of whether a ride is completed.

26.      Uber's "Terms & Conditions" contain a complete disclaimer of warranties, which disavows virtually every conceivable basis upon which a reasonable user would rely in using the app and the ride share service:

> The company makes ***no representation, warranty, or guaranty*** on the reliability, timeliness, quality, suitability, availability, accuracy or completeness of the service or application. ....

> The service and application is provided to you ***strictly on an "as is" basis. All conditions, representations and warranties,*** whether express, implied, statutory or otherwise, including, without limitation, any implied warranty of merchantability, fitness for a particular purpose, or non-infringement of third party rights, are ***disclaimed to the maximum extent permitted by applicable law ....***

> You acknowledge and ***agree that the entire risk*** arising out of your use of the application and service, and any third party services or products ***remains solely with you***, to the maximum extent permitted by law.

(Emphasis added).

27.     Uber's "Terms & Conditions" contain a "no refund" policy, encompassing

"[a]ny fees that the Company may charge you...." This "no refund policy shall apply at all times regardless of your decision to terminate your usage, our decision to terminate your usage, disruption caused to our Application or Service either planned, accidental or intentional, *or any reason whatsoever*." (Emphasis added).

28.     Uber's "Terms & Conditions" contain a Liability Disclaimer, by which Uber purports to absolve itself of all liability arising out of using its app or ride share service.

29.     Uber imposes upon every passenger a $1 "Safe Rides Fee." Uber expressly represents this Safe Rides Fee "supports our continued efforts to ensure the *safest possible platform for Uber riders* and drivers, including an *industry-leading background check* process, regular motor vehicle checks, driver safety education, development of *safety features in the app*, and insurance. For complete pricing *transparency*, you'll see this as a separate line item on every UberX receipt." (Emphasis added).

30.     Despite its express representation that it is "committed to connecting you with the safest rides on the road," Uber disclaims "*any and all any liability... in any way related to the third party transportation provider*...." (Emphasis added).

31.     Although it expressly represents that it employs an "*industry-leading background check* process, "Uber disclaims any responsibility to "*assess the suitability, legality or ability of any [drivers.]*" (Emphasis added).

32.     Although expressly representing that it conducts "regular motor vehicle checks [and] driver safety education," Uber's "Terms & Conditions" disavow any responsibility for the rider's safety: "**You understand, therefore, that by using the application and the service, *you may be exposed to transportation that is potentially dangerous, offensive, harmful to minors, unsafe* or otherwise**

7

**objectionable, and that** ***you use the application and the service at your own***

***risk.***" (Emphasis added).

### In Contrast, Uber's Surge Pricing Clearly Discloses Terms and Requires Customers to Affirmatively Agree to Those Terms

33.     In contrast to the passive "Terms & Conditions" disclosure, which does not

require the customer's affirmative assent to those terms, Uber informs the customer

before imposing any charges that surge pricing will be applied. Uber discloses the

amount of the surge pricing surcharge, and requires the customer to affirmatively agree

to that surcharge before it acknowledges that an agreement on those terms has been

reached between the customer and Uber.

34.     Uber's stated purpose for this multi-step process is that it wants to ensure

these contract terms are "clear and straightforward." *See* The Uber Resolution – Always

A Reliable Ride!, available at http://blog.uber.com/2012/12/28/surge2012/, last visited

on June 29, 2015.

35.     Uber illustrates this three-step process on its website.





36.     By using this "clear and straightforward" disclosure process, coupled with requiring the customer's affirmative election to accept the disclosed terms, Uber hopes to ensure that, at least with respect to its surge pricing, its customers "won't be surprised" by the terms of its contract. *Id.*

### Facts Pertaining to Mr. Tadepalli's Uber Transaction

37.     On July 23, 2014, Mr. Tadepalli used the Uber app to obtain transportation to SFO.

38.     Mr. Tadepalli paid $27.57 for the trip to the airport, including the $4.00 "SFO Airport Fee Toll."

39.     Uber itemized its charges as follows on the electronic invoice it sent to him via email:



40.     Mr. Tadepalli reviewed the charges Uber demanded he pay before he paid

9

Uber for his ride. Mr. Tadepalli relied on Uber's representation that Uber was collecting an "Airport Fee Toll" that would be passed on to SFO. Mr. Tadepalli was informed before he paid for his trip that a portion of the fees Uber was charging were fees supposedly being assessed by SFO and Uber was simply acting as a pass through for SFO.

41.     Mr. Tadepalli would not have paid any tax, fee, toll, or surcharge for airport pick-ups or drop offs to Uber if he had known that no such no such fee(s) existed.

42.     Mr. Tadepalli was damaged as a result of Uber's deceptive, unlawful, and unfair business practices.

## CLASS ALLEGATIONS

43.     When an Uber customer purchases a ride to or from a California airport, the customer receives an itemized electronic receipt, which often includes a charge for an airport toll.

44.     On Mr. Tadepalli's Uber receipt, next to the line for the "SFO Airport Fee Toll," there is a "?" hyperlink.

45.     The "?" hyperlink lead (the hyperlink has since been deled) to the Uber website, and contained the following explanation: "In select cities, there may be a nominal surcharge to reimburse drivers for any airport fees they are charged as part of your trip." *See What is this Charge For A Toll?*, previously available at: https://support.uber.com/hc/en-us/articles/201836666-What-is-this-charge-for-a-toll-., last visited on November 28, 2014.

46.     Uber vehicles, which are not licensed livery services, were not charged a tax, fee, or toll of any sort for picking-up or dropping-off dropping passengers off at California airports.

47.     Uber has imposed the fictitious Airport fees and tolls upon tens of thousands of passengers.

10

48.     The class is composed of all consumers who, since June of 2010:

    (a)     Uber passengers who were picked up or dropped off at California airports; and

    (b)     paid an Uber invoice including a charge designated as airport tax, fee, toll, or surcharge; and

    (c)     the airport did not impose any tax, fee, toll, or surcharge upon the Uber driver for the invoiced trip.

49.     Based on Uber's California airport ride volume, the prospective class numbers is at least in the tens of thousands, making joinder of all members impracticable. The exact size of the proposed class and the identity of the class members are readily ascertainable from Uber's business records.

50.     There are questions of law and fact common to the class, which predominate over questions affecting only individual class members. The principal common issues with respect to the class include: whether Uber's collection of airport fees is unlawful, unfair, or fraudulent within the meaning of California Business and Professions Code § 17200; whether Uber breaches its contract with class members; whether the collection of fees under false pretenses violates Uber's requirement of good faith and fair dealing; and whether Uber's retention of amounts collected from its passengers in excess of any actual airport related taxes, fees, tolls, or surcharges to actual airports paid constitutes unjust enrichment.

51.     There are no difficulties likely to be encountered by the Court in the management of this proposed class action. There are no individual questions, other than those which can be determined by ministerial inspection of Uber's records, and the issues of liability are determinable entirely from the face of the operative documents.

52.     Mr. Tadepalli's class claims are typical of those of the class he seeks to represent, and he will fairly and adequately protect and represent the interests of the

class. There is no conflict between the claims of Mr. Tadepalli as class representative and the claims of the proposed class.

53.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members may be relatively small compared to the expense and burden of litigation, it would be impractical and economically unfeasible for class members to seek redress individually. In addition, it is likely that most class members are unaware that they have claims. Finally, the prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications with respect to the individual class members against Uber.

54.     Mr. Tadepalli is represented by counsel competent and experienced in both consumer protection and class action litigation.

### FIRST CAUSE OF ACTION
**(Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

55.     Mr. Tadepalli incorporates by reference all the foregoing paragraphs.

56.     California Business and Professions Code § 17200 prohibits any "unlawful ... business act or practice." Uber has violated § 17200's prohibition against engaging in an unlawful act or practice by, *inter alia*, the following

       a.   violating the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*; and

       b.    violating California Business and Professions Code § 17500 *et seq.*;

       c.   violating California Civil Code § 1565 *et seq.*; and

       d.   violating California Civil Code § 1667 *et seq.*

57.     Mr. Tadepalli reserves the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and

continues to this day.

58.    California Business and Professions Code § 17200 prohibits any "unfair ... business act or practice." As detailed in the preceding paragraphs, Uber engages in a systematic scheme by imposing and collecting airport related taxes, fees, tolls, or surcharges from unsuspecting consumers using false pretenses. Mr. Tadepalli and class members would not have paid Uber airport related fees otherwise. As a result, Uber engages in unfair business acts and a practice that is prohibited by § 17200, *et seq.*

59.    California Business and Professions Code § 17200 also prohibits any "fraudulent ... business act or practice." As previously detailed, Uber's conduct was likely to deceive Mr. Tadepalli and class members by representing that it was imposing the toll to reimburse its drivers for the fees charged by airports, when in truth, the airports imposed no such fee.

60.    As a result of Uber's unlawful, unfair, and fraudulent business acts and practices Mr. Tadepalli and the class have suffered an injury in fact and lost money.

61.    Pursuant to California Business and Professions Code § 17203, Mr. Tadepalli seeks an order requiring Uber to immediately cease such acts of unlawful, unfair, and fraudulent business practices and requiring Uber to return the full amount of money improperly collected to Mr. Tadepalli and the class – plus interest and attorneys' fees.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

62.    Mr. Tadepalli incorporates by reference all the foregoing paragraphs.

63.    Uber and Mr. Tadepalli entered into a contract. Uber agreed to provide Mr. Tadepalli with a ride to SFO. Mr. Tadepalli agreed to pay Uber its customary fee for providing rides, and to reimburse Uber for any legitimate airport fees associated with the

ride.

64.     Uber charged Mr. Tadepalli an extra $4.00 to be dropped off at SFO. Uber represented that the $4.00 fee was imposed to reimburse its driver for a toll imposed by SFO as part of his trip to the airport. Mr. Tadepalli paid Uber's customary fee and the extra $4.00 and otherwise satisfied all of his contractual obligations.

65.     Uber breached its contract with Mr. Tadepalli when it charged and collected the $4.00 SFO toll from Mr. Tadepalli because SFO did not charge or collect any fees from Uber as part of Mr. Tadepalli's trip to SFO.

66.     As a proximate result of Uber's breaches, Mr. Tadepalli has been damaged. Uber should be required to disgorge its ill-gotten gains.

### THIRD CAUSE OF ACTION
### (Breach of Good Faith and Fair Dealing Duty)

67.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

68.     Uber's imposition of fictitious and inflated charges violates the covenant of good faith and fair dealing contained in its contracts.

69.     Uber's failure to act in good faith and deal fairly with Mr. Tadepalli and class members is part of a pattern, or consistent with a practice of noncompliance with its contractual obligations.

70.     Uber continues to act in bad faith and to breach the covenant by refusing to return overpaid amounts. As a proximate result of Uber's conduct described herein, Mr. Tadepalli and class members have been damaged.

71.     Uber would be unjustly enriched if it were permitted to retain the unlawfully charged and collected California airport related taxes, fees, tolls, and surcharges. Uber should therefore be ordered to provide restitution to Mr. Tadepalli and to the class of all amounts overpaid to Uber.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment and Restitution)**

72.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

73.     By charging and collecting fees for airport related trips, as described above, Uber has unjustly received a benefit at the expense of Mr. Tadepalli and the class.

74.     Uber would be unjustly enriched if it were permitted to retain the unlawfully charged and collected amounts. Uber should therefore be ordered to provide restitution to Mr. Tadepalli and the class of all amounts it charged and collected for California airport related trips.

**FIFTH CAUSE OF ACTION**
**(Accounting)**

75.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

76.     At various times continuing to the present, Uber has become indebted to Mr. Tadepalli and the class members for money received. The exact amount Uber owes to Mr. Tadepalli and the class can only be ascertained by an accounting.

77.     Mr. Tadepalli therefore requests the Court to order an accounting by Uber of all airport related fees, tolls, or surcharges Uber collected from passengers who were picked up or dropped off at California airports, which amounts constitute ill-gotten gains. Mr. Tadepalli requests that he and the class have judgment for all sums due, with interest thereon, as shown by such accounting.

**SIXTH CAUSE OF ACTION**
**(Conversion)**

78.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

79.     Mr. Tadepalli and class members, were, and still are, entitled to the possession of all monies paid to Uber for the fictitious airport related fees.

80.     Uber has converted Mr. Tadepalli's and class members' property to its own

use. As a proximate result of Uber's conduct described herein, Mr. Tadepalli and the class have been damaged.

## SEVENTH CAUSE OF ACTION
### (Fraudulent Concealment)

81.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

82.     Uber intentionally misrepresented to Mr. Tadepalli and the class that California airports were imposing additional fees for pick-ups and drop-offs.

83.     Uber intentionally misrepresented that airport related fees Uber charged and collected from Mr. Tadepalli and class members were imposed to reimburse its drivers for amounts paid to airports.

84.     Uber intentionally concealed from Mr. Tadepalli and the class that California airports did not impose on Uber any tolls for pick-ups or drop-offs.

85.     Uber misrepresented and concealed the true facts surrounding the nature and existence of the airport fees that it charged and collected from Mr. Tadepalli and the class.

86.     As a result of Uber's wrongful conduct, Mr. Tadepalli and the class have been damaged.

87.     The wrongful acts of Uber were done with the intent to mislead and defraud; Mr. Tadepalli and the class are entitled to exemplary damages in an amount appropriate to punish and set an example pursuant to California Civil Code §§ 3294 *et seq.*

## EIGTH CAUSE OF ACTION
### (Constructive Trust)

88.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

89.     Uber has held and continues to hold property belonging to Mr. Tadepalli and the other class members, by which Uber has been unjustly enriched.

90.     By virtue of the foregoing, in equity all such property in possession of Uber belongs to Mr. Tadepalli and the class, to be held in trust for their respective benefits, plus interest thereon.

91.     Mr. Tadepalli and the other class members have no adequate remedy at law and will suffer irreparable harm unless a trust is imposed on all such sums and property.

### NINTH CAUSE OF ACTION
### (Cal. Civ. Code §§ 1750, et. seq. ("CLRA"))

92.     Mr. Tadepalli incorporates by reference all of the foregoing paragraphs.

93.     The CLRA is a legislative embodiment of a desire to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

94.     Mr. Tadepalli and the class are "consumers" as defined by the CLRA. Uber provides and receives payment for "services" as defined by the CLRA.

95.     Uber violated and continues to violate the CLRA by engaging in the following unfair and deceptive business practices:

a.   Misrepresenting the source, sponsorship, approval, or certification of the airport fees.

b.   Misrepresenting an affiliation, connection, or association with California airports by charging and collecting airport related fees.

c.   Representing that transactions involving California airports confer or involve rights, remedies, or obligations which they do not have and are prohibited by law.

d.   Representing that the subject of transaction have been supplied in accordance with a previous representation when they have not.

e.   Inserting unconscionable provisions in contracts (charging the airport

17

fees when no such fees existed.

96.     By reason of the foregoing, Mr. Tadepalli and the class have been harmed, entitling them to injunctive relief, actual and punitive damages, disgorgement and restitution.

97.     On December 4, 2014, a CLRA notice letter was served on Uber which complies with California Civil Code § 1782(a). Mr. Tadepalli sent Uber the letter via certified mail, return receipt requested, advising Uber that it is in violation of the CLRA and must correct and rectify its violation by reimbursing Mr. Tadepalli and class members for all SFO Airport Fee payments. Uber did not respond to the CLRA notice letter within thirty days of receipt.

## PRAYER

WHEREFORE, Mr. Tadepalli prays for judgment against Uber as follows:

A.     An order certifying this lawsuit as a class action;

B.     Compensatory damages in such amount as the Court deems just and proper;

C.     Statutory damages in such amount as the Court deems just and proper;

D.     Imposition of a constructive trust, an order for an accounting, and granting injunctive relief, or other such equitable relief, including restitution and an order for disgorgement of ill-gotten gains;

E.     Attorney fees;

F.     Costs of litigation;

G.     Prejudgment interest; and

H.     Such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Mr. Tadepalli demands a trial by jury of all issues so triable.

18

DATED this 21st day of September 2015.

SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP


/s/ Todd M. Schneider
Todd M. Schneider
2000 Powell Street, Suite 1400
Emeryville, CA  94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com

BAILEY & GLASSER LLP
John Roddy
Elizabeth Ryan
125 Summer Street, Suite 1030
Boston, MA 02110
Telephone: (617) 439-6730
Facsimile: (617) 951-3954
jroddy@baileyglasser.com
eryan@baileyglasser.com

JAILE & TRIFILO LLC
Pedro Jaile
188 Summer Street
East Boston, MA 02128
Telephone: (617) 561-3777
Facsimile: (617) 561-0300
pjaile@jaileandtrifilo.com

*Attorneys for Plaintiff*

**PROOF OF SERVICE**

I am over the age of 18 and not a party to this action; my business address is Schneider Wallace Cottrell Konecky LLP, 8501 North Scottsdale Road, Suite 270, Scottsdale, Arizona 85253, cwilliams@schneiderwallace.com. On September 21, 2015, I served the following document:

**1.   Second Amended Class Action Complaint**

On the interested parties in this action by delivering a true copy thereof addressed as follows:

Laurence F. Pulgram
Tyler G. Newby
Annasara G. Purcell
Fenwick & West, LLP
555 California Street, 12th Fl.
San Francisco, CA 94104
Office: (415) 875-2300
Fax: (415) 281-1350
lpulgram@fenwick.com
tnewby@fenwick.com
apurcell@fenwick.com

Attorneys for Uber Technologies, Inc.

**BY MAIL**:   I placed for collection and processing such envelope(s) to be deposited in the mail at Scottsdale, Arizona with postage thereon fully paid to the office of the addressee(s) as indicated above.  I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day, with postage fully prepaid, in the ordinary course of business herein attested to (C.C.P. § 1013(a)).  I am aware that on a motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

**BY ELECTRONIC-MAIL**:  I electronically-mailed/served the document listed above as Item #1 on the counsel stated above.

I declare under penalty of perjury under the laws of the State of Arizona that the above is true and correct.

/s/ Clarence Williams
Clarence Williams